IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

BROOK JOEL DAVIS, :

    Plaintiff, :

vs. : CIVIL ACTION 07-0662-CG-C

MARENGO COUNTY JAIL, et al., :

    Defendants. :

REPORT AND RECOMMENDATION

Plaintiff, an Alabama prison inmate proceeding pro se filed a Complaint under 42 U.S.C. § 1983. This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the undersigned on Defendants' Motion for Summary Judgment (Docs. 13, 14), and Plaintiff's opposition thereto. (Doc. 18). For the reasons stated below, it is recommended that Defendants' Motion for Summary Judgment be granted and that Plaintiff's action against these Defendants be dismissed with prejudice.

I.  SUMMARY OF ALLEGATIONS AND PROCEEDINGS

1. From its review of the record, the Court summarizes the parties' allegations which are material to the issues addressed in this Report and Recommendation.

2. On June 20, 2007, Plaintiff was arrested and taken to the Marengo County Jail where he was charged with three counts of unlawful distribution and violation of probation. (Doc. 1 at 6; Doc. 13, att. 5 at 2, Arrest Report).

3. On July 2, 2007, Plaintiff was in a disciplinary segregation cell at the Marengo County Jail with five other inmates when a jail officer, Otis Jackson, approached the cell, sprayed a can of "mace" into the cell, and closed the tray slot in the door. (Doc. 1 at 4-5, Complaint; Doc. 13,

att. 7 at 3, 6-7, Jackson Declaration; Doc. 18 at 3, Plaintiff's Opposition).

4. After approximately five minutes, Officer Jackson opened the cell door and escorted Plaintiff and his cell mates to the exercise yard for fresh air. (Doc. 13, att. 7 at 6).

5. While outside, one of the inmates, Michael Bohannon, threatened Officer Jackson, and Officer Jackson responded by pulling a small knife from his pocket. (Id. at 7). Officer Jackson backed out of the yard and requested assistance to escort Plaintiff and his cell mates back to their cell. (Id.).

6. Because the altercation involved the deployment of pepper spray, Jail Administrator, Frank Watts, was called to the jail to investigate. He spoke with some of Plaintiff's cell mates but did not provide medical treatment to anyone, including Plaintiff, for exposure to mace.[1] (Doc. 1 at 4; Doc. 13, att. 1 at 3).

7. On September 18, 2007, Plaintiff filed the present § 1983 action. (Doc. 1). The Court construes Plaintiff's allegations as alleging an excessive force claim against Defendant Jackson and a denial of medical care claim against Defendant Watts.[2] (Id.).

8. Plaintiff claims that, as a result of Defendants' actions, he was "suffocat[ed]." (Id. at 5). Plaintiff seeks injunctive relief and compensatory damages. (Id. at 7).

---

[1] Plaintiff denies that he was allowed to speak with Administrator Watts. (Doc. 1 at 4).

[2] In the style of his Complaint, Plaintiff lists the "Marengo County Jail" as a Defendant. However, Plaintiff does not make any allegation against the Marengo County Jail. "In a § 1983 action, a plaintiff must establish a causal connection between a defendant's actions, orders, customs, policies, or breaches of statutory duty and a deprivation of the plaintiff's constitutional rights in order to state a claim upon which relief may be granted." Boglin v. Weaver, 2001 WL 228172, *14 (S.D. Ala. 2001) (unpublished). Because Plaintiff has failed to allege any causal connection between the Marengo County Jail and any alleged constitutional deprivation, he fails to state a claim upon which relief could be granted, and his action against the Marengo County Jail is due to be dismissed.

9. In their Answer and Special Report filed on December 27, 2007, Defendants deny Plaintiff's allegations and assert the defenses of absolute and qualified immunity.[3]  (Doc. 14 at 1-2, Answer).

10. Defendants respond that, on July 2, 2007, Plaintiff was in a disciplinary segregation cell at the Marengo County Jail, "cell 1095," with three other inmates.[4]  (Doc. 13, att. 1 at 3, Watts declaration).

11. During Officer Jackson's shift, the inmates in the cell became increasingly abusive toward Officer Jackson and the other jailers, yelling and cursing when the jailers walked by. (Doc. 13, att. 7 at 3, Jackson Declaration).

12. As part of the normal routine, the general population inmates were locked down at 9:00 p.m., after which the segregation inmates were allowed to leave their cell to take a shower. (Id.).  According to Defendants, Plaintiff and his cell mates became angry because they were not

---

[3] Plaintiff has sued Defendants in their official and individual capacities.  As state officials, Defendants are absolutely immune from suit for damages in their official capacities, see Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1277 (11th Cir. 1998) (state officials sued in their official capacities are protected from suit for damages under the Eleventh Amendment).  In addition, "[q]ualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)). Qualified immunity is not available with respect to a claim of excessive force.  See Skrtich v. Thornton, 280 F.3d 1295, 1301 (11th Cir. 2002).  Therefore, the only claim to which qualified immunity could apply is Plaintiff's claim for failure to provide medical treatment.  Having found herein that Plaintiff's allegations related to his lack of medical treatment in this case do not establish a constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201.

[4] Plaintiff claims that he was in a disciplinary segregation cell with five other inmates, not three.  (Doc. 18 at 3).  In any event, Defendants maintain that Plaintiff had a history of violence and disruption in the jail, which led to him being placed in disciplinary segregation on the day in question.  (Doc. 13, att. 1 at 6).

3

allowed to shower before 9:00 p.m. (Id.).

13. At 8:00 p.m., Anthony Olds began dispensing medication to the inmates in cell 1095.[5] (Id.). Officer Jackson was in the control room monitoring Olds' movements on the camera. (Id.).

14. When Olds arrived at Plaintiff's cell, inmate Michael Bohannon accused Olds of not giving him all of his medication. (Id.). Olds left and checked to see that the listed medications were all that inmate Bohannon had been prescribed. (Id.). Finding no other medications, Olds returned and informed inmate Bohannon that there was nothing else. (Id.).

15. Inmate Bohannon became angry, yelled, cursed, and started kicking the door. (Id.; Doc. 13, att. 6 at 2).

16. During that time, a work release inmate arrived, and Officer Jackson left the control room to check him in to the booking area, which was in the same area as cell 1095. (Doc. 13, att. 7 at 3). When Officer Jackson was checking in the work release inmate, he could hear the Plaintiff and his cell mates yelling, cursing, and hitting the door. (Id. at 4).

17. Officer Jackson approached cell 1095 and ordered the inmates to stop the disruption. They yelled and beat on the door louder. (Id.).

18. Inmate Bohannon accused Officer Jackson of withholding his medication and told him that he was going to "kick [his] ass" and, when he got out of jail, he was going to kill him. (Id.).

19. Plaintiff and the other inmates were yelling and running at the door and kicking it. (Id.). Officer Jackson told Bohannon to stop threatening him and tried, unsuccessfully, to get the

---

[5] It is unclear from the record whether Olds was an officer or a "trusty" at the jail.

4

other inmates to calm down.  (Id.).

20. Inmate Bohannon began spitting through the tray slot in the door, which was approximately twelve inches wide and six inches in height.  (Id.).  Officer Jackson ordered Bohannon to stop spitting, and the other inmates urged him to continue.  (Id. at 5).

21. Officer Jackson warned the inmates twice that he intended to use pepper spray if the spitting did not cease.  (Id.).  The spitting and yelling continued, and Officer Jackson sprayed pepper spray into the tray slot and closed it.[6]  (Id. at 6).

22. Officer Jackson returned to the booking area to check in the work release inmate, which took approximately five minutes.  (Id.).

23. Plaintiff and his cell mates calmed down, but Officer Jackson could hear them coughing.  (Id.).  Officer Jackson returned to the cell and released them into the exercise yard for fresh air.  (Id.).

24. Officer Jackson then directed several jail "trustys" to clean cell 1095, and he returned to the exercise yard.  (Id.).

25. When Officer Jackson stepped onto the exercise yard and closed the door behind him, inmate Bohannon approached him with his shirt off and his fists raised.  (Id.).  According to Officer Jackson, Plaintiff stated, "yeah, let's do this."  (Id.).

26. Officer Jackson retreated and, unable to find his pepper spray, pulled a small knife from his pocket.  (Id. at 7).

27. Officer Jackson opened the knife and continued to walk backward toward the door.

---

[6] The record shows that the pepper spray used by Officer Jackson was "Counter Assault OC-10," which had a stream nozzle.  It was not a "fogger."  (Doc. 13, att. 1 at 3; Doc. 13, att. 7 at 5).

He was able to retreat, and he returned to the control room and called for assistance.  (Id.).

28. Plaintiff and his cell mates were returned to cell 1095 without further incident.  (Id.).

29. According to Administrator Watts, when he questioned several of the inmates following the incident, including Plaintiff, none of them requested medical attention, nor did they appear to need medical attention.  (Id.; Doc. 13, att. 1 at 3-5).
 (Id.).

30. Subsequently, Officer Jackson was terminated for breaking security protocol by taking four inmates to the exercise yard alone while having the jail keys in his possession.  (Id.).

31. On January 4, 2008, the Court ordered that Defendants' Special Report and Answer be treated as a Motion for Summary Judgment.  (Doc. 16).  On January 25, 2008, Plaintiff filed a response in opposition to Defendants' motion.  (Doc. 18).  Defendants' motion and Plaintiff's response are now before the Court.

## II.  SUMMARY JUDGMENT STANDARD

1. In analyzing the propriety of a motion for summary judgment, the Court begins with these basic principles.  The Federal Rules of Civil Procedure grant this Court authority under Rule 56 to render "judgment as a matter of law" to a party who moves for summary judgment.  "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. . . .'"  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c).

2. The Court must view the evidence produced by "the nonmoving party, and all factual inferences arising from it, in the light most favorable to" that party.  Barfield v. Brierton, 883 F.2d 923, 934 (11th Cir. 1989).

      3. However, Rule 56(e) states that:

> an adverse party [to a motion for summary judgment] may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e); see also Celotex Corp., 477 U.S. at 325-27.

      4. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . .  If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (internal citations omitted).  "Summary judgment is mandated where a party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc., 508 F.3d 641, 647 (11th Cir. 2007) (citations omitted).

### III.  DISCUSSION

      1. As discussed above, Plaintiff seeks redress in this action pursuant to 42 U.S.C. § 1983 for alleged constitutional deprivations arising out of an altercation between himself, his cell mates, and Defendant Jackson on July 2, 2007, while Plaintiff was incarcerated in the Marengo County Jail.

      2. Plaintiff claims that Defendant Officer Jackson used excessive force in spraying pepper spray into his cell and in threatening him with a knife.

      3. Plaintiff further claims that Defendant Watts denied him medical care after he was exposed to the pepper spray.

4. Section 1983 provides in pertinent part that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983 (1994).

5. In addressing Plaintiff's claims brought under § 1983, the Court begins its analysis "by identifying the specific constitutional right allegedly infringed. . . ." Graham v. Connor, 490 U.S. 386, 394 (1989).

6. In this case, it is unclear from the record whether Plaintiff was being held in the Marengo County Jail as a convicted prisoner for violating his probation, in which case the Eighth Amendment applies to him, or as a pretrial detainee on the charges of unlawful distribution, in which case the Fourteenth Amendment is applicable. See Williams v. Limestone County, Ala., 198 Fed. Appx. 893, 896 n.3 (11th Cir. 2006) (citing Bell v. Wolfish, 441 U.S. 520 (1979)). However, under either analysis, the result is the same.

7. "'[T]he standard for providing basic human needs to those incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments.'" Purcell ex rel. Estate of Morgan v. Toombs County, Ga., 400 F.3d 1313, 1318 n.13 (11th Cir. 2005) (quoting Marsh v. Butler County, Ala., 268 F.3d 1014, 1024 n.5 (11th Cir. 2001)); see also Bozeman v. Orum, 422 F.3d 1265, 1271 (11th Cir. 2005) ("'it makes no difference whether [plaintiff ] was a pretrial detainee or a convicted prisoner because 'the applicable standard is the same. . . .'") (citations omitted); Dailey v. Hunter, 2006 WL 4847739, *2 (M.D. Fla. 2006) ("the legal standards under

8

the Eighth Amendment and the Fourteenth Amendment due process clause are the same, and the Eighth Amendment case law is applicable."); Williams, 198 Fed. Appx. at 896 n.3 ("the standard for violations of the Eighth Amendment apply to pretrial detainees through the due process clause.").

   A. Excessive Force.

   8. The Eighth Amendment allows a convicted inmate to be punished as long as that punishment is not "cruel and unusual." Bell, 441 U.S. at 535 n.16 (citing Ingraham v. Wright, 430 U.S. 651, 671-72 n.40 (1977)). Specifically, the Eighth Amendment "prohibits the unnecessary and wanton infliction of pain. . . , the infliction of pain totally without penological justification. . . , [and] the infliction of punishment grossly disproportionate to the severity of the offense." Ort v. White, 813 F.2d 318, 321 (11th Cir. 1987) (citing Rhodes v. Chapman, 452 U.S. 337, 346 (1981)).

   9. In order to establish an Eighth Amendment claim, an inmate must prove both an objective and subjective component. First, the plaintiff must show that the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation, and, second, he must show that "the officials act[ed] with a sufficiently culpable state of mind," *i.e.*, that they acted "maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7-8 (1992).

   10. Under the Fourteenth Amendment, a pretrial detainee "may not be punished prior to an adjudication of guilt in accordance with due process of law." Bell, 441 U.S. 520, 535 (1979). Therefore, the use of excessive force against a pretrial detainee amounting to punishment is strictly prohibited. See Graham, 490 U.S. at 395 n.10.

   11. However, "not every application of intentional force rises to the level of a deprivation of due process." Bozeman, 199 F. Supp. 2d 1216, 1229 (M.D. Ala. 2002) (citing Johnson v.

Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).

12. "As a general rule, to prevail on a claim of a substantive due-process violation, a plaintiff must prove that a defendant's conduct 'shocks the conscience.'" Lumley v. City of Dade City, Fla., 327 F.3d 1186, 1196 (11th Cir. 2003) (quoting Nix v. Franklin County School Dist., 311 F.3d 1373, 1375 (11th Cir. 2002)).

13. In the prison security context, the factors used to determine whether there has been a violation of the Eighth Amendment are essentially the same as those used under a Fourteenth Amendment analysis: the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived, any efforts to temper the severity of a forceful response, and the extent of injury suffered.[7] Hudson, 503 U.S. at 7 (citing Whitley v. Albers, 475 U.S. 312, 321 (1986)).

14. Considering the evidence in the light most favorable to Plaintiff, the question is whether a jury could reasonably conclude that Defendant Jackson violated Plaintiff's rights under either the Fourteenth or Eighth Amendment.

15. Under the circumstances of this case, the Court finds that Plaintiff's allegations fail to

---

[7] In assessing the actions of a corrections officer under the Fourteenth Amendment, the Eleventh Circuit has adopted the analysis set forth by the Second Circuit in Johnson v. Glick, 481 F.2d 1028 (2d Cir. 1973):

> Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights. In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

Gilmere v. City of Atlanta, Ga., 774 F.2d 1495, 1500-01 (11th Cir. 1985) (quoting Johnson, 481 F.2d at 1033). Accord Bozeman, 199 F. Supp. 2d at 1229.

establish a violation under either amendment.

16. In assessing the factors enumerated above, specifically, the threat reasonably perceived by Defendant, the need for the use of force, and Defendant's motive in using force, it is evident that the disruptive behavior of at least one of Plaintiff's cell mates, Michael Bohannon, created a chaotic and dangerous situation which undermined the authority and control of the jailers.

17. Plaintiff admits that Bohannon was arguing with Officer Jackson about his medications, and he does not dispute that Bohannon was yelling, cursing, banging, spitting, kicking, and threatening to kill Officer Jackson.[8]  (Doc. 18 at 2, Plaintiff's Opposition).

18.  Therefore, the need to use some measure of force to restore order was present, and there is no indication that Officer Jackson's motive in spraying the pepper spray into the cell was anything other than a good faith effort to end Bohannon's violent outburst and restore discipline and control.

19. With respect to the amount of force used by Defendant, the Court is mindful that, while an inmate must be protected from the "'unnecessary and wanton infliction of pain' by prison officials," prison officials must maintain order and discipline "in an often dangerous and unruly environment." Ort, 813 F.2d at 321-22.  Thus, prison officials must be extended deference "in acting to insure the proper administration, safety and security of a penal institution." Id. at 322.

20. "'The infliction of pain in the course of a prison security measure, therefore, does not

---

[8] Plaintiff states that he and his other cell mates were sitting quietly during the argument. (Doc. 18 at 2, Plaintiff's Opposition).

11

amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense.'" Id. at 323 (citations omitted).

21. With these considerations in mind, the Court finds that the force used by Defendant Jackson, *i.e.*, spraying pepper spray into Plaintiff's enclosed cell to stop the violent outburst of another inmate, was applied for the purpose of restoring order and was not, in any event, excessive.

22. Officer Jackson repeatedly ordered everyone in the cell to stop yelling, cursing, spitting, and hitting the door. (Doc. 13, att. 7 at 4-5). His orders, at least by inmate Bohannon, went unheeded. (Id.).

23. Officer Jackson then twice warned that he would spray mace into the cell if the disruption did not cease, and again the warnings went unheeded. (Id.).

24. Officer Jackson's use of pepper spray, after his warnings had failed, ended a threatening exchange that was escalating in intensity.

25. By using pepper spray, Officer Jackson avoided the use of physical force by himself and the other jailers against Bohannon and possibly other inmates in the cell to stop the disruptive behavior, thereby tempering the severity of the forceful response. Cf. Vinyard v. Wilson, 311 F.3d 1340, 1348 (11th Cir. 2002) (recognizing that "pepper spray is a very reasonable alternative to escalating a physical struggle with an arrestee.").

26. Moreover, within minutes of applying the pepper spray, Defendant returned to the cell and led Plaintiff and his cell mates outside to the exercise yard for fresh air and ordered that

12

their cell be cleaned before they were returned to it.[9] (Doc. 18 at 2-3; Doc. 13, att. 7 at 6).

27. In addition, Plaintiff complains that Officer Jackson threatened him with a pocket knife once on the exercise yard. However, Plaintiff admits that, when Officer Jackson took them to the exercise yard to get fresh air, Michael Bohannon attempted to attack Officer Jackson, and Plaintiff had to pull him away. (Doc. 18 at 3).

28. The Court finds that Officer Jackson's brandishing of a pocket knife after being threatened on the exercise yard by inmate Bohannon was not unreasonable given the fact that Officer Jackson faced an immediate attack, while alone on an exercise yard with six inmates, and his need to escape was urgent and real.

29. Considering the final factor, the extent of injury suffered, the Court is mindful that inherent in the protection afforded by both the Fourteenth and Eighth Amendments is the principle that "not 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" Clark v. Johnson, 2000 WL 1568337, *12 (S.D. Ala. 2000) (unpublished) (quoting Hudson, 503 U.S. at 9-10).

30. Under the Fourteenth Amendment, "[t]here is . . . a *de minimis* level of imposition with which the Constitution is not concerned." Ingraham, 430 U.S. at 674.

31. Similarly, the objective component of an Eighth Amendment excessive force claim "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided

---

[9] The record shows that, as part of Officer Jackson's training, he was exposed to pepper spray "so [he] would understand what it felt like." (Doc. 13, att. 1 at 3). Officer Jackson was instructed that the two best methods for decontamination are time and air. (Doc. 13, att. 1 at 3; Doc. 13, att. 7 at 5-6). He was trained to move the exposed person to an area with circulating air and allow the effect of the spray to wear off. (Id.).

that the use of force is not of a sort 'repugnant to the conscience of mankind.'"[10]  Hudson, 503 U.S. at 9-10 (quoting Whitley, 475 U.S. at 327).

32. The record in the present case is devoid of evidence of injury to Plaintiff from his exposure to pepper spray.  Although Plaintiff claims that he told Administrator Watts that he needed to see a doctor, even Plaintiff does not allege any significant ill effects from the pepper spray.

33. The only evidence of Plaintiff's physical reaction to his exposure to pepper spray was Officer's Jackson's statement that he heard "coughing" in the cell minutes after he sprayed the pepper spray, at which time he took Plaintiff and his cell mates to the exercise yard for fresh air. (Doc. 13, att. 7 at 6).

34. There is no evidence of any prolonged physical distress to any of the inmates, including Plaintiff, from their exposure to the pepper spray.

35. While the Court is aware that, even in the absence of serious or significant injury, a plaintiff can establish a constitutional claim based on excessive force, Defendant's actions in this

---

[10] While the Supreme Court in Hudson did not define "*de minimis* use of force," it held that neither "serious" nor "significant" injury is required to satisfy the objective component of an Eighth Amendment claim, nor is any arbitrary quantum of injury an absolute requirement of an excessive force claim, apparently out of concerns that certain forms of torture are capable of inflicting extreme pain without leaving any mark or tangible injury.  Id. at 9 ("Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.").  At the same time, the court suggested that the degree of injury received is relevant to determining whether more than *de minimis* force was used.  See id., 503 U.S. at 10 (blows causing bruising, swelling, loosened teeth and a cracked dental plate do not constitute a *de minimis* use of force).  In the present case, there are no allegations of torture designed to inflict extreme pain without leaving tangible injury or conduct that otherwise is so egregious that one could reasonably call it repugnant to the conscience of mankind.  Therefore, the extent of Plaintiff's injury is an important factor in determining whether more than *de minimis* force was used.

case, as described by Plaintiff, do not involve diabolic or inhuman torture designed to inflict extreme pain without leaving any mark or tangible injury, nor are they otherwise so egregious that one could reasonably call them repugnant to the conscience of mankind.

36. Accordingly, the Court finds that, in this case, Plaintiff's allegations simply do not support his claim that he was subjected to anything other than *de minimis* force, which is insufficient to establish a constitutional violation under the Fourteenth or Eighth Amendment. See Fischer v. Ellegood, 238 Fed. Appx. 428, 431, 2007 WL 1624315, *3 (11th Cir. 2007) (unpublished) (affirming summary judgment for jail employees on Eighth Amendment excessive force claim where pepper spray was administered for purpose of restoring order, and it was "doubt[ful]" that plaintiff suffered any injury from the exposure).

37. Accordingly, whether analyzed under the Eighth or Fourteenth Amendment, Plaintiff's excessive force claim fails as a matter of law.

B. Inadequate Medical Treatment.

38. "[T]he minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner; both the right to due process and the right to be free from cruel and unusual punishment are violated by a government official's deliberate indifference to **serious** medical needs."  Lancaster v. Monroe County, Ala., 116 F.3d 1419, 1425 n.6 (11th Cir. 1997) (emphasis added).

39. Having found herein that Plaintiff suffered nothing more than *de minimis* injury as a result of his exposure to pepper spray, he can have no claim under the Eighth or Fourteenth Amendment for failure to provide adequate medical care for a "serious" medical need.  Id.

40. Therefore, Defendant Watts is entitled to judgment on Plaintiff's denial of medical care claim as a matter of law.

## IV.  CONCLUSION

41. If a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial," Rule 56(c) mandates that summary judgment be entered against the nonmovant.  Celotex Corp., 477 U.S. at 322.

42. "No material issues can be in dispute where the plaintiff's evidence fails to establish a constitutional violation."  Bennett v. Parker, 898 F.2d 1530, 1534 (11th Cir. 1990).  Therefore, since no constitutional violation has been established, Defendants' Motion for Summary Judgment is due to be granted.

43. Based on the foregoing, the Court concludes that Defendants are entitled to summary judgment in their favor on all claims asserted against them by Plaintiff.

44. Accordingly, it is recommended that Motion for Summary Judgment of Defendants Otis Jackson, Frank Watts, and the Marengo County Jail be GRANTED and that the entirety of Plaintiff's Complaint against these Defendants be DISMISSED with prejudice.

The instructions which follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

DONE this 18th day of July, 2008.

                           s/William E. Cassady
                           WILLIAM E. CASSADY

UNITED STATES MAGISTRATE JUDGE

# MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
# AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
# AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

1.      **Objection**.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court. Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge. See 28 U.S.C. § 636(b)(1)©; Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.      **Opposing party's response to the objection.**  Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection.  Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.      **Transcript (applicable where proceedings tape recorded)**.  Pursuant to 28 U.S.C. § 1915 and Fed. R. Civ. P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.